**THE KAMBER LAW GROUP, P.C.**
1275 Glenlivet Drive, Suite 100
Allentown, PA 18016
T: 484.224.3059
F: 484.224.2999
www.KamberLegal.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTINE FEIT<br>*Plaintiff,*<br><br>v.<br><br>LEHIGH UNIVERSITY<br>*Defendant.* | No.<br><br>Jury Trial Requested |

## COMPLAINT

By and through counsel, The Kamber Law Group, P.C., Plaintiff Christine Feit bring these complaints and charges of discrimination under Title VII of 1964 against Lehigh University for harassment and retaliation.

**I.   PARTIES**

1.  Plaintiff Christine Feit ("Feit") is an adult female individual, residing at 1650 Stanford Road, Bethlehem, PA 18018.

2.  Defendant Lehigh University ("Lehigh," "University" or "Defendant") is a private college organized and operated under the laws of the Commonwealth of Pennsylvania, located at 27 Memorial Drive West, Bethlehem, PA 18015.

**II.   JURISDICTION**

8.  All events took place in Northampton County, Pennsylvania.

1

9. Lehigh University is located in Northampton County, Pennsylvania.

10. Mrs. Feit worked in Northampton County, Pennsylvania.

11. On November 7, 2017, Plaintiff filed a complaint within three hundred (300) days with the Pennsylvania Human Relations Commission the Equal Employment Opportunity Commission.

12. On or about July 29, 2018, the Pennsylvania Human Relations Commission transferred the case to the Equal Employment Opportunity Commission for investigation.

13. The Equal Employment Opportunity Commission closed its file on February 28, 2019 and issued a right to sue letter, received by Plaintiff on or about March 4, 2019.

## III. BACKGROUND

12. Feit worked for Lehigh University from July 3, 2008 until May 4, 2017.

13. Feit was employed as a Certified Medical Assistant ("CMA") in Lehigh University's Health Center ("Health Center").

14. Feit's immediate supervisor was Adriane Stasurak, Nursing Supervisor (Stasurak).

15. Dr. Thomas Novak (Novak) was and is a physician working in the Health Center.

16. Novak was a supervisor for Feit at all relevant times.

17. On or about May 2016, Dr. Susan Kitei, the Medical Director ("Kitei"), left her position, and Lehigh University appointed Novak as Interim Medical Director for the Health Center.

18. Novak remains as Interim Medical Director as the date of this complaint.

19. As a CMA, Feit's job duties included but not limited to patient intake, checking vital signs, performing lab tests, limited types of direct clinical care within her scope of practice,

maintaining clinical supplies, maintaining medical equipment, state reporting of STI, influenza and other reportable diseases, maintaining lab proficiency, coordinating with the athletic department to maintain NCAA guidelines and schedule sports physical clinics, maintain laboratory statistics, completing the ACHA Annual Collage Health Survey, scheduling student appointments as necessary and covering administrative duties as needed.

***Novak's Harassment of Christine Feit***

20. When she first joined the Health Center, Feit learned from her female coworkers that Novak had a pattern of behavior: when new female staff joined the Health Center, Novak would become friendly toward them, then sexually forward, and then sexually inappropriate.

21. Feit's coworkers told her that if she complained about Novak, nothing would be done by Lehigh, and Novak would alienate the complainer, so there was nothing to be accomplished by complaining.

22. After her first few months of employment, Feit noticed that Novak's comments to her became sexual: Novak made sexual comments about students, staff and even pop culture icons.

23. In 2009, approximately a year into her employment, Novak started making comments about Feit's clothing, outfits, and what brassieres would best suit her.

24. Novak started to make routine comments about Feit's skirts and pants and the way they made Feit's buttocks look.

25. Novak started commenting about Feit wearing clothing that was either tight fitting, or if any cleavage could be seen, that Feit should wear them more often.

26. Novak routinely commented any time he saw Feit wear a sports brassiere, saying it was not "flattering enough" and she should not wear them.

27. Novak routinely made sexual statements about his wife to Feit.

28. Feit's job required her to stock supplies in the medical room, located across from Novak's office door.

29. Novak routinely would find Feit stocking supplies, and he would comment about her "bending over" or would say "isn't there anything that has to be stocked on the lower shelves?"

30. Despite Feit's efforts to stock only when Novak's door was closed, supplies were stocked twice per day, and these comments occurred anytime Novak's door was open and Feit had to stock supplies.

31. If Feit was scheduled to assist Novak with gynecological exams, he would routinely brush his body against Feit in the small lab outside of the room where the paper work and lab supplies were gathered.

32. Novak would routinely lean in and smell Feit's hair. One occasion, Novak startled Feit by leaning in on her when she was getting ice from the freezer making her jump. When she jumped, she cut the back of her hand on the icemaker. Novak looked at the cut and told Feit to get bandage for it.

33. Also, by example, a student asked Novak and Feit about having a breast reduction during a medical review, as she was considering surgery. In front of Novak, Feit told the student she had personally experienced the surgery, and she could answer any questions the student had.

34. After the appointment, Feit's colleagues told her that Dr. Novak was making jokes and comments about Feit's breasts and her reduction surgery.

***Novak's Harassment of Feit's Female Coworkers***

35. Novak sexually harassed Feit's female coworkers.

4

36. Novak made ongoing comments about the administrative assistant any time she wore a skirt, including that he liked the way she walked when she wore a skirt.

37. Feit heard Novak tell an administrative assistant that his wife wanted to have a "three-way" and asked the assistant what she thought about it and what he should do.

38. Novak gave an inappropriate homemade birthday card to same assistant, who was very upset by it.

39. Novak copied an article from Good Housekeeping regarding how "good wives" should behave and passed out copies to all the female employees that worked under him.

40. Novak emailed a joke about "butts" to several employees.

41. Novak made a comment about an employee's son, who was coming in as a freshman, stating that mother needed to buy "plenty of extra sheets" because he was "going to have a lot of sex."

42. Every year, when the Sports Illustrated Swim Suit issue came out, Novak made a very big deal about it; he often made comments about certain celebrities, especially Brooklyn Decker, Kate Upton, and Charlize Theron, including what he would like to do to them sexually.

43. Novak would routinely comment about female students he saw that he thought was pretty or "hot."

44. Novak would routinely comment on students with large breasts saying, "Did you see the size of those?"

45. Novak made a comment after seeing a male homosexual student "Aaron," that the student was "checking out his junk" and said, "I think he wants me."

46. After reviewing gynecological health history forms, Novak would routinely remark about students' sexual orientation and the types of sex that they would have specifically pointing out which ones engaged in anal sex and would state that they were "wild."

### *The Impact of the Harassment on Feit*

47. Feit was constantly upset and angered by Novak's comments and actions.

48. Feit felt forced to not wear anything that she felt would trigger a comment from Novak; by 2016, she would often turn around and go home in the morning to change her clothes if, while driving to work, she felt what she was wearing would elicit a comment.

49. Feit sought to avoid being alone with Novak but had work alongside him to keep her job.

50. Feit sought to avoid speaking with Novak and when she could not, she tried to keep the conversations professional and short.

51. Novak routinely turned the conversations to inappropriate topics.

52. Feit was emotionally harmed by Novak's ongoing harassment of her.

### *Complaints to Lehigh University about Novak*

53. Feit complained repeatedly about Novak's sexual harassment of her and his sexual misconduct toward others to her supervisors and to Human Resources.

54. Throughout Feit's tenure with Lehigh, she complained to Stasurak about Novak's sexual harassment of her and others, as did other employees.

55. Feit also complained to Stasurak that Novak was inappropriately performing breast exams on students.

56. Feit complained that she always had to hand Novak gloves during pelvic exams because he would attempt to proceed without them as per protocol.

6

57. On one occasion, in 2016, Stasurak asked if Novak were "copping a feel," with students, to which Feit said "yes." Stasurak told Feit that it's good to know that it's the first exams for these girls, so they wouldn't know something was wrong.

58. In Fall 2012, Novak told Feit, along with a female coworker, not to schedule him any "fat or ugly chicks."

59. Feit reported the incident to Stasurak, and that Novak had been performing inappropriate breast exams on female students. She told Stasurak she could not, in good conscience, schedule any other female student with him, unless they expressly asked for him.

60. In response, Stasurak, per Dr. Kitei, stripped Feit's job duty of scheduling female patients.

61. When Feit complained about Novak to Stasurak throughout the years, Stasurak repeatedly told Feit that Novak was watching everyone and that they cannot give him any reason to fire them.

62. In 2012 upon learning of other inappropriate sexual behavior from two other employees, Feit, along with two other employees, reported Novak to Human Resources.

63. Feit spoke with Judith Zavalydriga ("Zavalydriga") in Human Resources.

64. Feit stated that Novak's behavior was unacceptable and had to stop.

65. Zavalvdriga had a meeting with Novak and Feit.

66. Novak started to cry during the meeting and tearfully apologized.

67. When Zavalvdriga asked Feit what she wanted from the meeting, Feit told Zavalydriga that she did not want to see Novak terminated, because he was allegedly the sole provider for his family. Feit told Novak she did not accept his apology and she did not want him

7

disparaging her or retaliating against her, as he did other subordinates who had complained to Lehigh about him.

68. After the meeting, Novak told other employees that Feit was "dead" to him.

69. Within a month, Novak returned to his prior improper sexual harassment.

70. When Feit complained to Kitei about Novak's comments, including Novak's directive that she not to schedule ugly or fat girls with him, Kitei stripped Feit of her job duties in retaliation.

71. Despite her repeated complaints, nothing was done to address Novak's actions.

72. Feit was pretextually terminated by Lehigh University for complaining of Novak's sexual harassment.

73. Of the three employees who reported Novak, one left shortly after reporting Novak and the other was terminated shortly thereafter.

74. On or about March 2016, Feit reported an incident regarding Novak to Stasurak, who reported the matter to Human Resources.

75. On or about April 2016, Linda LeFever, of Human Resources, ("LeFever") held a meeting with Novak, Feit, and another staff member who also had complained about Novak's behavior.

76. Feit and the staff member told LeFever about Novak's harassing behavior.

77. Novak began to cry, making tearful excuses for his behavior.

78. LeFever immediately stopped the meeting to allow Novak to recover his emotions.

79. Feit emailed LeFever numerous times for a new date.

80. LeFever said she was busy and would get back to Feit.

81. LeFever never rescheduled the meeting.

82. Feit felt outraged and upset by Novak's actions.

83. Feit was very upset and concerned for students and disgusted by Novak's actions.

84. Feit was angry about Novak's refusal to change.

85. Feit was shocked that Human Resources would not address the issues with Novak.

86. On or about April 27, 2017, a nurse asked Feit to look at a student ("D_")[1] allergy chart because he did not understand the schedule.

87. D_ had been prescribed allergy injections by his provider, to be performed at the Health Center.

88. As it does with each patient, the Health Center maintained a medical chart with D_'s allergy injections, including doses.

89. The chart was supposed to be reviewed by his provider, a certified medical assistant or registered nurse from Lehigh.

90. D_'s dose, according to the chart, was recorded as higher than that prescribed by the allergist.

91. Despite this, the chart had been filed, and the patient had received his injections with Feit.

92. Unaware of the error, Feit had administered the dosage according to the information filed on the chart.

---

[1] Names of patients, also students, have been shortened to initials to protect privacy.

93. Each time he was scheduled for the injection, D_'s chart was reviewed and signed by a provider who never caught the error.

94. Upon review in April 2017, Feit discovered the patient's allergy schedule was not correct: neither a certified medical assistant or registered nurse had reviewed the chart, and the patient's provider signed the chart but did not catch the dosing error.

95. Feit immediately reported the issue to Stasurak.

96. Feit contacted the student and the allergist to assess any harm; D_ reported no reaction whatsoever to the error in concentration.

97. Feit contacted the allergist to assess any harm.

98. The allergist responded with a letter instructing that D_'s injections continue at the new concentration.

99. Normally, in cases of medication errors, the Health Center would convene a staff meeting to discuss safety.

100. Normally, no employee would be formally reprimanded.

101. In the instant case, Stasurak wrote Feit up for causing the error falsely, knowing that Feit did not cause the error.

102. Stasurak also wrote up Feit falsely for allegedly treating a student's injury without having a physician or Certified Registered Nurse Practitioner review it.

103. A student, "A_" had come into the Health Center; while wearing sandals, he had scraped his big toe.

104. Feit told Stasurak that she had not treated the student without proper review; she had placed A_ on the schedule for both Dr. Kitei and herself.

105. She treated the injury pursuant to proper protocol by treating the wound.

106. The student had to wait to see Dr. Kitei and was impatient to leave for a class.

107. Feit checked on the student several times, and after about twenty minutes, the student said he had to leave.

108. Feit advised him that leaving was against medical advice ("AMA") and urged him to stay and be seen by the doctor.

109. He insisted he had to leave, and Feit urged him, a minimum, to return immediately after class, which he agreed to do.

110. Administrative Assistant, Christina Finley, ("Finley") witnessed the conversation and the student's refusal to stay.

111. Stasurak ignored Feit's explanation and told her to sign the writeup, stating it only acknowledged that they had the discussion

112. Stasurak also falsely alleged Feit made or was written up for "multiple injection errors" between 2012 and 2015.

113. On May 4, 2017 a meeting with Stasurak in the afternoon was added to Feit's schedule.

114. At the time of the meeting, Stasurak informed Feit that the meeting was to be held at Human Resources.

115. Feit was aware that, historically, when employees are asked to go to Human Resources, they usually are terminated.

116. Feit asked Stasurak if she should take her belongings. Stasurak said "bring what you need."

117. Feit met with Stasurak and Zavalydriga.

118. Stasurak stated "There cannot be any errors."

11

119. Feit complained again about Novak's behavior and how nothing is done to address the situation, to which Zavalydriga said "We're not here to discuss Tom."

120. Defendant had no basis in fact to terminate Feit lawfully.

121. Defendant unlawfully terminated Feit based on knowingly and intentionally untrue facts.

122. Defendant's termination of Feit was pretextual and done in response to Feit's complaint of sexual harassment and sexual misconduct against Novak.

## IV. CLAIMS

### COUNT I: GENDER DISCRIMINATION

123. Plaintiff repeats her allegations from paragraphs 1-122.

124. Plaintiff is a female.

125. Interim Medical Director, and her supervisor's supervisor, Novak sexually harassed Plaintiff throughout her tenure with Defendant based on her gender.

126. Plaintiff witnessed Novak's ongoing sexual harassment of other employees and students.

127. Plaintiff complained repeatedly to Defendant's management, but Defendant protected Novak and took no action to stop Novak's ongoing harassment of employees and students.

128. Plaintiff suffered harm due to Novak's ongoing sexual harassment.

129. It is believed, and therefore averred, that Defendant discriminated against Plaintiff because of her gender under Title VII of the Civil Rights Act.

### COUNT II: RETALIATION

130. Plaintiff repeats her allegations from paragraphs 1-129.

131. Plaintiff complained to Defendant on an ongoing basis that she was being sexually harassed by Novak, the Interim Medical Director.

132. Plaintiff complained to Defendant on an ongoing basis that she was forced to witness Novak's sexual harassment of other staff and female students.

133. After Plaintiff repeatedly complained of Novak's harassment, in retaliation, Defendant stripped her job duties.

134. After Plaintiff repeatedly complained of Novak's harassment, in retaliation, Defendant pretextually terminated her employment.

135. It is believed, and therefore averred, Defendant retaliated against Plaintiff because of her complaints of illegal harassment under Title VII of the Civil Rights Act.

## V. REMEDIES REQUESTED

As the direct and proximate result of defendants' discriminatory, retaliatory, and harassing treatment, plaintiff have been caused to suffer and is requesting damages in the form of lost wages; anticipated wages; out-of-pocket expenses including attorney's fees and costs; emotional distress; mental anguish; reinstatement, reinstatement of benefits, pain and suffering; inconvenience; humiliation; loss of the enjoyment of life; and punitive damages.

THE KAMBER LAW GROUP, P.C.

Date: May 22, 2019

By: _____
Deirdre Kamber Todd, Esquire
ID No. 92613
1275 Glenlivet Drive, Suite 100
Allentown, Pa 18106
484.224.3059
DKT@KamberLegal.com
*Attorney for Plaintiff*

## VERIFICATION

I, _____, hereby state and aver that I have read the foregoing **PLAINTIFF'S COMPLAINT**. The factual statements contained therein are true and correct to the best of my knowledge, information and belief. This statement is made subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsification to authorities, which provides that if I make knowingly false statements, I may be subject to criminal penalties.

DATE: 5.20.19

| | |
|---|---|
| **UNITED STATES DISTRICT COURT** <br> **EASTERN DISTRICT OF PENNSYLVANIA** | |

| | |
|---|---|
| CHRISTINE FEIT <br> *Plaintiff,* <br><br> v. <br><br> LEHIGH UNIVERSITY <br> *Defendant.* | No. <br><br> Jury Trial Requested |

## CERTIFICATE OF SERVICE

I, Deirdre Kamber Todd, hereby certify that Plaintiff's Complaint has been filed with the Court on May 22, 2019, and Defendant has been served in accordance with the Rules of Court.

Dated: *05/22/2019*            BY:   /s/ *Deirdre Kamber Todd*
                                                Deirdre Kamber Todd
                                                ID No. 92613
                                                THE KAMBER LAW GROUP, P.C.
                                                1275 Glenlivet Drive, Suite 100
                                                Allentown, PA 18106
                                                (484) 224-3059
                                                DKT@KamberLegal.com
                                                *Attorney for Plaintiff*